*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re T. WHEELER, Minor.

UNPUBLISHED
May 18, 2023

No. 363485
Kent Circuit Court
Family Division
LC No. 21-050154-NA

Before: MARKEY, P.J., and MURRAY and FEENEY, JJ.

PER CURIAM.

In this case arising from a child protective proceeding, respondent-mother appeals by right the trial court's opinion and order terminating her parental rights to her minor child. The trial court terminated respondent's parental rights to her son under MCL 712A.19b(3)(c)(*i*), (g), (i), and (j). On appeal, respondent argues that the Department of Health and Human Services (Department) failed to provide her with reasonable services designed to reunify her with the child, and she suggests that the Department should have taken additional steps to accommodate her intellectual disability. She also impliedly asserts that the trial court clearly erred when it found that the Department established the grounds for termination and that termination was in the child's best interests. Because we conclude that respondent fails to establish any errors that warrant relief, we affirm.

## I. REASONABLE EFFORTS

## A. PRESERVATION

We first address respondent's claims that the Department did not make reasonable efforts to reunify her with the child and did not provide her with adequate accommodations under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq*. To preserve a challenge premised on the adequacy of the services provided by the Department, a respondent must object to the case service plan or assert that the plan is inadequate when the court adopts the plan or soon thereafter. See *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos. 358502 and 358503); slip op at 2. Likewise, a claim that the Department failed to make accommodations consistent with the ADA must be raised in a timely fashion. *In re Terry*, 240 Mich App 14, 26 n 5; 610 NW2d 563 (2000).

Respondent did not object to the case service plan generally or challenge the nature of the accommodations that the Department made in light of her diagnoses. She did indirectly assert that she should have been given in-person instruction on a gastrostomy tube (G-tube) instead of video or Facetime instruction. But she did not frame that contention as a challenge to the accommodations provided by the Department; rather, her lawyer suggested that in-person instruction would have better served respondent's needs. Respondent argued that the evidence demonstrated that she could have provided adequate medical care for her child through alternate means, such as bringing him to a clinic each week for his infusions. This argument called into question whether the evidence supported the trial court's termination ruling, but it did not amount to a challenge to the reasonableness of the services or accommodations. Respondent also did not assert that the Department failed to comply with the ADA. Therefore, we conclude that respondent did not preserve a challenge to the adequacy of the Department's case service plan, nor did she preserve an argument that the Department failed to comply with the ADA.

## B. STANDARD OF REVIEW

This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes and court rules. *In re Ferranti*, 504 Mich 1, 14; 934 NW2d 610 (2019). This Court reviews for clear error a trial court's factual findings. *In re Gonzales/Martinez*, 310 Mich App 426, 430; 871 NW2d 868 (2015). A trial court's finding is clearly erroneous when, on the entire record, this Court has the definite and firm conviction that the trial court made a mistake. *Id.* at 430-431. Finally, this Court reviews claims of error that were not properly preserved for appellate review for plain error affecting the parent's substantial rights. *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). A plain error will only warrant relief if it affected the outcome of the proceeding or if it seriously affected the fairness, integrity, or public reputation of the judicial proceeding. *Id.* at 9.

## C. ANALYSIS

The Department normally has an affirmative duty to make reasonable efforts to reunify a respondent with his or her child before seeking the termination of parental rights. See *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017); see also MCL 712A.18f(3)(b); MCL 712A.19a(2). To that end, the Department in this case created a case service plan that included a schedule of services to be provided to respondent. See *In re Hicks/Brown*, 500 Mich at 85-86. When providing services, the Department had to give respondent a reasonable time to make changes and benefit from the plan. *In re Mason*, 486 Mich 142, 159; 782 NW2d 747 (2010). "[E]fforts at reunification cannot be reasonable under the Probate Code if the Department has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *In re Hicks/Brown*, 500 Mich at 86. The parent bears the burden to show that he or she would have fared better with the accommodation. See *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005).

As a preliminary matter, the Department argues that it had no obligation to make reasonable efforts to reunify respondent with the child because the trial court earlier terminated respondent's rights to another child, and respondent had not rectified the conditions that led to that termination. See MCL 712A.19a(2)(c) (stating that reasonable efforts to reunify a child and parent need not be made when the "parent has had rights to the child's siblings involuntarily terminated and the parent

-2-

has failed to rectify the conditions that led to that termination of parental rights"). The record reflects that the trial court terminated respondent's rights to the other child on grounds that were similar to those at issue with the child involved in this case. Respondent failed to provide the child in the earlier case with proper care for her special needs, engaged in unhealthy relationships that jeopardized her ability to care for that child, and had issues with her emotional stability.[1] Accordingly, we conclude that the Department had no obligation to provide reunification services because there was record evidence that respondent had not rectified the conditions that led to the prior termination by the time the Department petitioned to remove the child at issue in this case. In any event, the record established that the Department made reasonable efforts.

Dr. Robert J. Baird diagnosed respondent in relevant part with borderline intellectual functioning. Dr. Baird indicated that some parents with intellectual challenges of that nature can safely parent. He suggested that the Department should first ensure that respondent had the ability to develop and retain new skills. If she could not demonstrate such ability, Dr. Baird wrote, "there should be reservation in placing the child in her custody." Dr. Baird also summarized the nature of services that would best help respondent. He suggested that the Department use "verbal instruction; task analysis; illustrations; role play and behavioral rehearsal; modeling; discussion; peer-to-peer discussion; feedback; and reinforcement."

The Department's caseworkers applied Dr. Baird's suggestions for the services provided to respondent in the case involving her first child. The Department's original caseworker created: a binder for respondent with visual aids, role-playing models, simplified versions of the case service plan, a list of every provider involved, which included their contact information and their role, and handouts discussing her child's care and medical needs. She stated that a similar binder included respondent's homework involving child milestones and bonding strategies. The caseworker also referred respondent to classes that used modeling and role-playing to give respondent a better opportunity to acquire the skills necessary to care for the child. She met with respondent frequently and provided her with another binder that had a color-coded calendar to help her keep her scheduled appointments. The caseworker additionally called and reminded respondent of appointments.

The caseworker assigned to the instant case, Sarah Murphy, also followed Dr. Baird's recommendations from the inception of the case. Murphy testified that she gave respondent "monthly to-do lists" and calendars to help her remember her tasks and appointments. She also provided respondent with "picture diagrams" of the child's exercises and illustrated handouts explaining his medical needs. Murphy gave respondent written summaries of the Department's expectations in addition to a copy of the case service plan and spoke to the other service providers about respondent's cognitive limitations. And the other service providers utilized various techniques—including easy reader—to accommodate respondent.

The child had special needs that made it imperative that respondent benefit from the services, and there is no indication in the record that the accommodations were insufficient to

---

[1] See *In re Wheeler*, unpublished per curiam opinion of the Court of Appeals, issued May 21, 2020 (Docket No. 350939); slip op at 1-2.

allow respondent to benefit from the services provided to her. The child had been diagnosed with hemophilia B and had microdeletion syndrome. The syndrome is a rare congenital disease that causes low growth, intellectual deficits, and autism. Doctors surgically implanted a port into the child to allow for weekly infusions to treat his hemophilia. The port had to be kept sterile, or the child could develop a life-threatening infection. Also, because the child also had problems swallowing and retaining food, doctors had to implant a G-tube to assist with feeding.

In order to safely parent the child, respondent had to master the care and use of the implants. She also had to learn about the other care needs unique to the child. On appeal, respondent faults the Department for failing to provide her with additional services involving the care and use of the infusion port. More specifically, she contends that the Department should not have allowed different nurses to teach her on different occasions because, in her view, if she had been provided a lone teacher, she would have mastered the handling and care of the child's infusion port. The trial court disagreed and found that, under the facts of this case, "having the same nurse really would not have affected the outcome." The record supports the trial court's finding.

Murphy testified at an earlier hearing and opined that the nursing staff at the clinic had done a very good job of accommodating respondent's needs when training her on the care and use of the infusion port. She believed that they did an excellent job of breaking the procedures down to a level that could easily be understood, giving respondent notes on the process. Murphy stated that respondent was not learning in part because the child distracted her at times. For that reason, the staff asked that the child no longer be present, which Murphy arranged. Murphy opined that she could not see how the staff could have done a better job to accommodate respondent in learning the procedure. At yet another hearing, Murphy indicated that the hemophilia clinic normally trained a person over three sessions, but respondent still had not been able to meet the minimum requirements after six sessions. By the time of the termination hearing, respondent had been going to the clinic for several months and still had not learned how to perform the infusion on a dummy without guidance and prompting.

The evidence showed that the nursing staff broke the procedure down into easily understood steps, provided respondent with hands-on instruction, and gave her written notes on the process. The staff repeated the training for far more than the normal three sessions—indeed, it provided her with training over several months—and yet respondent still did not master the care and use of the infusion port. On this record, we are not left with a definite and firm conviction that the trial court was mistaken when it found that respondent would not have benefited by having the same nurse teach her at each of those many sessions.

Respondent also maintains that it was not necessary for her to master the care and use of the infusion port because she could still meet the child's needs by bringing him to the clinic and having the staff perform the infusions. But there was testimony that, although respondent could take the child to the clinic each week for his medicine, there were times when the medicine had to be administered on an emergency basis. Respondent would not be able to administer the medicine during an emergency, so she would have to take the child to the hospital. Moreover, there was testimony that in the past she had not demonstrated an ability to immediately get the child to the hospital. Given that the child will need his medication indefinitely, it was reasonable for the trial court to conclude that respondent's inability to learn how to use and care for the child's infusion

port constituted evidence that respondent would not be able to provide the child with the medical care that he needed. See *In re Terry*, 240 Mich App at 28.

To be sure, there was testimony by a nurse that respondent had participated in services, had demonstrated the ability to meet some of the child's medical needs, and had shown that she could keep doctor's appointments. But there was also evidence that she had not demonstrated sufficient skills to adequately care for the child's unique medical needs. The trial court was in the best position to resolve any conflict in the evidence, see *In re Miller*, 433 Mich 331, 344; 445 NW2d 161 (1989); MCR 2.613(C); MCR 3.902(A), and it found that respondent would not be able to safely meet the child's medical needs. The trial court did not clearly err in that regard.

Respondent similarly argues that the Department should have offered her in-person services to teach her how to use and care for the child's G-tube. The Department's caseworker sent respondent videos on the proper use of the G-tube and offered to have the child's foster mother demonstrate the appropriate care and use of the G-tube via Facetime.[2] Respondent refused those services and requested in-person training. Respondent could not refuse a service merely because she was of the opinion that a different service would better serve her needs; she had the obligation to participate in the services provided. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Respondent's refusal to participate in the services was evidence that she was unable or unwilling to learn how to care for the child's medical needs. See *In re Terry*, 240 Mich App at 28.

Respondent has not identified any additional services that the Department should have provided her that would have made a difference in the outcome. See *In re Fried*, 266 Mich App at 543. Therefore, she has not identified any plain errors involving the ADA or the Department's reasonable efforts. See *In re Utrera*, 281 Mich App at 8-9. Moreover, the record revealed that the Department accommodated respondent's special needs and provided her with services that were reasonably calculated to reunify her with the child. In sum, we hold that the trial court did not clearly err when it found that the Department made reasonable efforts at reunification.

## II. STATUTORY GROUNDS FOR TERMINATION AND BEST INTERESTS

### A. STANDARD OF REVIEW AND GOVERNING PRINCIPLES

In *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020), this Court set forth the following framework with respect to appeals challenging the statutory grounds for termination and the best-interests determination:

> If a trial court finds that a single statutory ground for termination has been established by clear and convincing evidence and that it has been proved by a preponderance of the evidence that termination of parental rights is in the best interests of a child, the court is mandated to terminate a respondent's parental rights to that child. This Court reviews for clear error the trial court's ruling that a statutory ground for termination has been established and its ruling that termination is in the children's best interests. A finding is clearly erroneous if the reviewing court has a

---

[2] Murphy explained to respondent that the child's feeding schedule did not align with respondent's parenting-time schedule, making in-person training on use of the G-tube impossible.

definite and firm conviction that a mistake has been committed. When applying the clear error standard in parental termination cases, regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it. [Quotation marks, citations, brackets, and ellipses omitted.]

## B. GROUNDS FOR TERMINATION

The trial court terminated respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (g), (i), and (j), which authorize termination under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> \* \* \*

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> \* \* \*

> (i) Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and the parent has failed to rectify the conditions that led to the prior termination of parental rights.

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

On appeal, respondent does not directly challenge the trial court's findings that the Department established these grounds to terminate her parental rights. As such, this Court may presume that the trial court did not clearly err by finding that the unchallenged statutory grounds were established by clear and convincing evidence. *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo*, 462 Mich 341, 353 n 10; 612 NW2d 407 (2000). Nevertheless, respondent has not shown that the trial court clearly erred with respect to any of the statutory grounds.

Respondent's inability to master the proper care and use of the child's infusion port and her refusal to participate in the services designed to show her how to care for and use the child's G-tube demonstrated that she could not safely meet the child's medical needs. There was also evidence that respondent more generally lacked insight into the child's medical needs and how to meet those needs.

-6-

Respondent suggests that the trial court should not have faulted her with respect to an incident in which the child had a temperature of 105 degrees after returning from a visitation with respondent. She essentially blames the Department for that incident because the Department should not, in her view, have allowed the child to participate in parenting time with a fever. She claims that none of the child's other caregivers noticed the fever. There was, however, no evidence that the Department or anyone else knew that the child had a fever before the parenting-time visit. There was, by contrast, evidence that respondent realized that the child was warm during the visit, told no one, and took no steps to verify whether he might have a temperature over 101 degrees.

The medical staff had taught respondent that she needed to be aware of the child's temperature and informed her that she had to take him to the emergency room whenever his fever exceeded 101 degrees because an infection could be fatal. Respondent's failure to follow the proper procedure for addressing a fever was reminiscent of her earlier failure to address a cut and bruise that the child suffered. Medical professionals advised respondent that every cut had to be screened for internal bleeding, yet respondent did not call to have the child screened for internal bleeding when a cut occurred simply because the cut had stopped bleeding externally. The evidence that respondent did not take any steps to respond to signs that the child had a fever permitted an inference that respondent still did not fully appreciate the level of vigilance required for the child's care and continued to ignore the advice of medical professionals, which was one of the factors that led to the adjudication. The trial court did not clearly err when it inferred from the incident involving the fever that respondent had not overcome the concerns that led to the adjudication.

Respondent also complains that the trial court only found that she could not attend to the child's medical needs on the basis of this one incident regarding the fever. That complaint is not well taken. There was testimony that respondent was distracted at doctor's appointments and spent more time playing with the child than engaging with the doctors. Indeed, the distractions were such that the nursing staff at the clinic asked that respondent attend classes without the child. There was also evidence that Murphy provided respondent with binders so that she could keep all her medical papers in order and take notes. Despite that effort, respondent chose not to bring the binders to appointments and brought her own notepads, which she did not use. That evidence suggested that respondent would not fully engage in future appointments. Respondent needed to demonstrate that she could fully engage with medical personnel at appointments. Her inability to do so suggested that she was unlikely to acquire the knowledge and skills from these appointments to provide the child with proper medical care.

Respondent also argues that the trial court should not have faulted her for her failure to maintain or use the binders. She explains that she could have accessed the same information digitally through the medical providers' electronic charting, so she did not need binders. Respondent cites no evidence that she had been able to successfully use the digital charting system as an alternate to paper records and notes. Rather, as the trial court correctly noted, there was evidence that respondent needed personal intervention to remind her of appointments and procedures even though there were digital reminders. When considered together with the evidence that respondent failed to master the care and use of the infusion port, refused to utilize the learning materials to master the care and use of the G-tube, failed to properly respond to the indicia that the child had a fever, and was distracted at appointments, the evidence that respondent did not make use of the binders and did not take notes at appointments was evidence that she would be unable

to profit from doctors' appointments. On the record before it, the trial court did not clearly err when it found that respondent's limitations continued to pose a barrier to her ability to learn how to properly care for the child's medical needs notwithstanding the reasonable efforts provided to her.

Respondent also faults the trial court for finding that she would put her new child's needs ahead of those of the child at issue. There was testimony that respondent consistently attended the child's medical appointments until the birth of her new child. Thereafter, her attendance dropped precipitously. Respondent also did not visit the child during his last two emergency room visits because she had to feed the new baby. Furthermore, there was testimony that respondent chose not to visit her son during his surgery even though she was already at the hospital visiting her new baby. Similarly, respondent struggled to divide her time between the new baby and her son during parenting-time visits. The evidence supported the trial court's finding that respondent would be unable to properly prioritize her time so as to provide her son with the necessary medical care while also parenting the new child.

Respondent additionally contends that the trial court was mistaken in its findings that she still had barriers to reunification related to her decisions involving relationships, her emotional stability, and her ability to maintain proper housing. The trial court found it noteworthy that respondent had selected another partner who interjected instability into her life at a time when the child needed a stable parent. The court felt that this was evidence that respondent was following the same pattern that she had followed in the past relative to relationships. Although the court believed that respondent had made some progress in this area, it nevertheless concluded that respondent's relationship choices remained a barrier.

There was evidence that respondent had a tense relationship with her previous partner, who was also her son's father. Although the relationship did not involve physical violence, it nevertheless interfered with respondent's ability to parent the child. Respondent abruptly ended that relationship to enter into a relationship with her current partner, which jeopardized her son's welfare. Respondent was also apparently pregnant with the new partner's child during the breakup of her previous relationship. The change in relationships caused instability for respondent, her partners, and the child. Respondent also gave up her Section 8 housing to move in with the new partner. Further, the new partner had a history with children's protective services and admitted to having mental-health issues, but he refused to participate in counseling or other services. There was also evidence that respondent's new partner had engaged in behaviors that had previously triggered emotional outbursts from respondent. The totality of the evidence indicated that respondent lacked insight into how her relationship choices affected her ability to parent and her children's welfare. The trial court did not clearly err when it found that respondent's continued poor relationship choices—when considered with other factors—constituted a barrier to reunification.

The trial court was further correct when it found that respondent had not shown that she could provide stable housing for the child. As already discussed, respondent gave up stable and appropriate housing in order to move in with her new partner. That evidence was itself sufficient to permit an inference that she lacked the ability to make reasonable choices about housing. In addition to that evidence, there was evidence that even though respondent had been provided with

services to teach her how to maintain her home, she allowed the new home to become cluttered. The new home also had problems with the flooring that posed a trip hazard.

Clutter and defects in the flooring might not be a concern for a normal child, but, as the trial court aptly noted, respondent's son is a medically fragile child with a severe form of hemophilia. He also had developmental disabilities and stability issues. Taken together, the child was at heightened risk of severe injury from a fall. The evidence that respondent made poor choices that adversely affected her housing, and that she was unable or unwilling to go extra lengths to ensure that her home was as safe as it could be given her son's needs, demonstrated that she had not benefited from the services regarding housing. The trial court, therefore, did not clearly err when it found that housing remained a barrier to reunification.

Finally, although there was evidence that respondent had made progress on her emotional stability, there was also evidence that respondent still struggled with regulating her emotions. Respondent maintains that even if there were evidence that she continued to have some problems with emotional stability, that evidence did not support termination because there was no indication that her emotional outbursts were a risk to her son. There was testimony, however, that respondent opposed medical procedures for her son on emotional grounds rather than on the basis of medical advice. There was also testimony that her emotional outbursts interfered with her ability to work with others for her son's benefit. Accordingly, although reasonable persons might differ about the weight and credibility of the evidence, there was sufficient evidence to support the trial court's finding that respondent's emotional stability remained a barrier.

Respondent fails to establish that any of the trial court's findings involving the grounds for termination were clearly erroneous. The trial court's individual findings about the continued barriers proved that respondent had not rectified the conditions that led to the adjudication. They also supported the conclusion that there was no reasonable likelihood that she could rectify the conditions within a reasonable time considering the child's age. Therefore, the trial court did not clearly err when it found that the Department proved by clear and convincing evidence grounds to terminate respondent's parental rights to the child under MCL 712A.19b(3)(c)(*i*). Those same findings also supported the trial court's determinations that the Department established the remaining statutory grounds for termination. In sum, we conclude that respondent has not shown that the trial court clearly erred when it found that the Department proved by clear and convincing evidence that the grounds for termination existed.

## C. BEST INTERESTS

In *In re Mota*, 334 Mich App at 321, this Court discussed the best-interests analysis, stating as follows:

> With respect to a child's best interests, we focus on the child rather than the parent. In assessing a child's best interests, a trial court may consider such factors as a child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the

possibility of adoption. The trial court may also consider how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all. [Quotation marks, citations, and brackets omitted.]

Respondent does not challenge the trial court's best-interest findings in her statement of the questions presented, and she does not adequately argue and analyze that particular claim of error. Accordingly, respondent has abandoned any claim that the trial court's findings regarding the child's best interests were clearly erroneous. See *In re Rippy*, 330 Mich App 350, 362 n 5; 948 NW2d 131 (2019).

In any event, the trial court did not clearly err when it found that termination was in the child's best interests. The evidence showed that the child had a strong bond with respondent. That bond, however, did not outweigh the child's significant medical needs. The child's safety required a caregiver who could provide him with consistent, constant, and informed care in a safe setting. The evidence revealed that the child had been placed with a family that included his half-sister and caregivers who were ready, willing, and able to provide him with the care that he so desperately needs. The record reflected that respondent would not be able to provide that care within a reasonable time, if ever. Under the circumstances, the child's need for permanence and stability outweighed the bond that he had with his mother. The record supported the trial court's best-interest finding, and we are not left with a definite and firm conviction that the trial court erred. In short, we hold that reversal is unwarranted.

We affirm.

/s/ Jane E. Markey
/s/ Christopher M. Murray
/s/ Kathleen A. Feeney